IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ANGELA TUCKER,                          *
                                        *
                    Plaintiff,          *
vs.                                     *            No. 4:10cv00909 SWW
                                        *
                                        *
ENTERGY ARKANSAS, INC.,                 *
                                        *
                    Defendant.          *

<u>MEMORANDUM AND ORDER</u>

Angela Tucker, a white female, brings this action against her employer, Entergy

Arkansas, Inc. (Entergy), alleging race and sex discrimination and retaliation under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.  The matter is before the Court on

motion of Entergy for summary judgment [doc.#9].  Tucker has responded in opposition to

Entergy's motion and Entergy has filed a reply to Tucker's response.  For the reasons that

follow, the Court grants Entergy's motion for summary judgment.

I

Entergy is a corporation engaged in electric power production and distribution of

electricity to its customers.  Tucker became a regular full-time employee of Entergy in May 2002

as a Customer Service Representative (CSR) and has held that same position since.

Entergy has several call centers in Arkansas, Louisiana, Texas, and Mississippi that are

staffed by CSR's.  A CSR sits in a cubicle in a large room with other CSR's answering customer

calls and may handle from between 100-110 calls per day.  Customer calls are routed to the first

available CSR regardless of the call center in which that CSR is located and may involve simple

questions about a bill or a request to turn power off at a certain location or they may involve

customer complaints.  The CSR uses a computer database or program to pull up the customer's account information so that the representative can address the customer's concern on the call. The CSR then makes a note in the software about the customer request and the action taken.

Among the duties a CSR may perform is working the "One Point Desk," also known as the Arkansas Escalation Desk.  The One Point Desk is specifically assigned to Arkansas CSR's who work with customer relations to try and handle "escalated" customer calls, *i.e.*, when one CSR is not able to satisfy a customer and the customer requests to speak with someone higher, before a customer goes and files a complaint with the public service commission.  Tucker acknowledged that there is no raise in pay in working the One Point Desk but states that "[t]he advantage of being on the One Point Desk is learning more in-depth processes and procedures of all sorts of accounts" and that "having the One Point Desk as a background gives you more leverage because you know more" when other job opportunities come up.

Tucker states that in March 2009 she had begun pointing out that black employees with less seniority were "working the One Point Desk, doing special projects."  She states that she asked the supervisor at the time, Barbara Rogers, who is black, about the One Point Desk assignments and that Rogers informed her that "the One Point Desk is not a revolving position and that they chose people who, basically who they wanted to."

Tucker contends that other employees were picked for positions because of their race, although when asked for the facts upon which she based such a belief Tucker stated it was because the coworkers are all good friends with the supervisors.  Similarly, she contended that coworker Marva Hill, who is black, was assigned a special project promoting Entergy's website because she sits next to supervisor Sherita Taylor, who is black, and goes and gets

Taylor's lunch. Tucker believes that Hill should not have been allowed to do a special project because her average call handle time was over six minutes.[1]

Tucker also complained that another call center supervisor, Vera Jones, who is black, sent her an email on July 16, 2009 reminding her not to "go into another segment" unless the supervisor knows beforehand.[2]  Tucker admitted that she was not disciplined in any manner, but claims that because the email was worded in bold and used all capital letters, she "felt like it was threatening."  She admits, however, that she may have been in the "miscellaneous" segment on July 16, which means she was unavailable to take a call, prompting the email.

On September 11, 2009, Tucker received a coaching and counseling letter for looking back at a customer's account long after she had handled a call.  Tucker sent an email to four other white coworkers asking them if they had ever gone back to look at an account to try to determine if there was any customer wrongdoing, such as trying to get power back to their home after it had been turned off.  Tucker admits, however, that she did not look back at the customer account to determine whether there was some sort of customer wrongdoing–a permissible reason for looking back at a customer account–but that she looked back at the customer account to see whether supervisor Jones had written anything negative about her in the customer account notes screen.  In this respect, Tucker, who at the time was handling escalated calls, states that a customer was transferred to her from coworker Pauline Blackburn, who is black, and complained to her that Blackburn had been rude.  Tucker reported that customer's complaint to supervisor

---

[1] According to Tucker, CSR's are to keep their call handle time under six minutes.

[2] Any time a CSR is at work and logged on her computer, she must be in one of several "segments."  One segment, is taking a call, while other segments might indicate she is on break, not available, in training, or "miscellaneous."  The CSR's status must be coded correctly. For example, an employee is not supposed to be in "miscellaneous" while taking a break or going to the restroom.

Jones.  Because of the nature of the business such complaints are fairly common but Tucker "just wanted to see what [Jones] had wrote about me in that complaint."  Tucker agreed that looking back at the customer account violates policy, but contends that coworkers Sharman Winn and Monique Williams, who are both black, looked back at a customer account and were not disciplined.  Tucker admitted, however, that a coaching and counseling letter is not discipline and that a grievance she filed related to this letter was denied because a coaching and counseling letter is not discipline.

On September 16, 2009, five days after receiving the coaching and counseling letter, Tucker filed a charge of discrimination with Equal Employment Opportunity Commission (EEOC) in which she checked the boxes for race and retaliation and alleged that she had been discriminated against beginning March 20, 2009 based on race and in retaliation for reporting unlawful employment practices.  Tucker stated as follows:

> I was hired on May 25, 2002, as a Customer Service Representative.  During the term of my employment, I have been harassed in the form of comments and conduct, and subjected to different terms and conditions of employment in regard to assignment of special projects and working the one point desk.  On one occasion in May 2009, and two occasions in June 2009, I contacted the ethics office and reported discrimination based upon my race, white.  On September 11, 2009, I was given a coaching and counseling document.
>
> I have not been given a reason for the harassment or as to why I have been subjected to different terms and conditions of my employment.  The Supervisor wrote that I received the coaching and counseling document because employees are expected to follow privacy guidelines.
>
> I believe I have been harassed, subjected to different terms and conditions of employment, and disciplined because of my race, white, and in retaliation for reporting unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended.

On September 21, 2009, Tucker reported to supervisor Taylor that coworkers Winn and

Williams had inappropriately discussed a customer call–the same customer that was transferred to Tucker from coworker Blackburn as an "escalated call"–although she admitted she could not hear Winn's and Williams's exact words.  Tucker admits she reported this alleged violation because she received the coaching and counseling letter, and Taylor told Tucker "since it was brought to her attention, she had to address it."  Tucker admits she has no facts to support an allegation that Taylor failed to investigate her complaint and she admits that had the customer talked to one CSR in the morning and called back in the afternoon it would be appropriate for the second CSR to ask the first about the earlier call.  Taylor states that this is in fact what happened and that it was not a violation of policy.

Tucker states that she took it upon herself to monitor and report what she perceived to be violations of company policy by coworkers after receiving the coaching and counselor letter. She states that prior to getting the coaching and counseling letter, she was "fine" and "happy" and enjoying her job, but that after getting the letter, she "started feeling that if there needs something to be addressed to, then that's what I'm going to look and start addressing because it's not right.  It's not fair. ... I'm trying to stand up for what is right and being equal, and I don't feel like I am being treated equal there in the phone center.  So since I got this letter, ... then yes, I feel that, you know, they are overlooking a lot of things, especially the cell phones."

For example, Tucker once raised the question as to whether she could bring a DVD player or TV to work because she saw coworker Hill watching a personal TV or DVD player. When this was brought to the attention of supervisor Taylor all employees were told that they could not watch TV or DVD's at work.  Tucker states that after Hill was told by Taylor to put her TV away, Hill made a remark to her (Tucker) indicating her unhappiness, although she could

not remember what the remark was.

Tucker also states that she had reported coworkers texting on their cell phones or leaving their desk without their shoes on, following which disparaging remarks were made.  For example, Tucker states that in May 2010 she walked by the One Point Desk and that certain coworkers commented "There goes the tattletale" and that on another occasion between May and August 2010 a coworker commented as she walked by the One Point Desk, "There goes the bitch."[3]

Tucker also states that a coworker allegedly stated to others, "Better hope I don't see her [Tucker] at Wal-Mart," which Tucker acknowledged was made because she had told on the coworker for not wearing shoes.  Tucker states she said hello to this coworker and that the coworker "told me to my face, you don't need to speak to me.  You turned me in for not wearing my shoes, and then you want to speak to me.  You are being two-faced."  Tucker states she responded, "No, I am just following policy."   Tucker then reported that exchange.

In response to Tucker's reports of violations of company policy by coworkers, supervisor Taylor told Tucker that "we can't, we can't watch everybody, but if it comes to our attention we will address it."  Tucker "assum[es]" that Taylor "has indeed addressed [her complaints] when it has been brought to her attention" and she admitted that every time she complained to call center manager Larry Shields, who is white, the company would investigate and talk to the witnesses that she asked them to talk to.  The witnesses identified by Tucker, however, would not support her allegations.

_____

[3] Tucker states in her statement of material facts that the "tattletale" comment occurred on May 19, 2009.  In her deposition, however, Tucker, in response to a comment from counsel stating that this incident occurred on May 19, 2009, clarified that it actually occurred on May 2, 2010.  Tucker's deposition testimony is certainly consistent with her assertion that she began reporting coworkers for alleged violations of company policy after receiving her coaching and counseling letter in September 2009 and that before receiving that letter she was "fine" and "happy" and enjoying her job.

After Tucker received the coaching and counseling letter in September 2009, she asked to be taken off the escalation queue.  In June 2010, Tucker asked to be put back on the queue, so that she could "one day get the One Point Desk and learn that position."  However, supervisor Taylor told her there were sufficient CSR's in the escalation queue at the time and Tucker "believed her that she said that there was enough."

Tucker contends that she was retaliated against by not being assigned to the One Point Desk, "probably when [she] started making all of these—bringing up attention of violations."  When Tucker was asked who it was that she believed was assigned to that position instead of her because of her prior complaints of discrimination, Tucker replied, "Maybe because they go to the same church together, and they are friends."  She admits, however, that the individuals who had been assigned to the One Point Desk in 2010 had been working the escalation queue and had not to her knowledge been asked to be taken off.  Tucker does not point to any opening or assignment to the One Point Desk in the time before she filed her EEOC charge.

Tucker complained to her union steward, Gary Mitchell, who is white, about not being assigned to the One Point Desk.  Mitchell told her that the company goes by a CSR's statistics, availability, and attendance, and Tucker agreed with Mitchell's assessment.  Tucker states she has had several conversations with Mitchell about her working environment and that he told her "to stop being the police up there and do [her] job."

With respect to the September 2009 coaching and counseling letter, Tucker states that this is the first act of retaliation of which she is complaining.  She further states that her last complaints of discrimination prior to receiving that letter were in June 2009.

The EEOC issued Tucker a Notice of Right to Sue letter dated April 16, 2010, following which Tucker filed this action on July 15, 2010.[4]

## II

Entergy moves for summary judgment on grounds that there are no facts from which a reasonable juror could infer discrimination or retaliatory intent.  Entergy argues the material facts are undisputed and judgment in its favor should be entered as a matter of law.

## A

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of his pleading, but "must come forward with 'specific facts showing ... a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita,* 475 U.S. at 587 (citations omitted).  However,

---

[4] Apparently, Tucker filed a second EEOC charge of discrimination in October 2010 after this action was filed alleging retaliation.  Tucker, however, never moved to amend her complaint to reflect the allegations in that second EEOC charge (assuming a Notice of Right to Sue letter was ever issued).

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*[5]

B

1

The Court first addresses Tucker's argument, as set forth in her response to Entergy's motion for summary judgment, that she has established a claim of race discrimination based on a failure to assign her to special projects to which she has applied.  The Court finds that Entergy is entitled to summary judgment on this claim.[6]

The *McDonnell Douglas* frame work requires a plaintiff to first establish a prima facie case of discrimination.  *Torgerson v. City of Rochester*, 605 F.3d 584, 595 (8th Cir. 2010).  A plaintiff can establish a prima facie case of discrimination by showing (i) that she belongs to a racial minority; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her

---

[5] "There is no 'discrimination case exception' to the application of summary judgment, a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, No. 09-1131, slip. op. at 14 (8th Cir. Jun. 1, 2011) (en banc).  "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed."  *Id.*

[6] In her brief in support of her response to Entergy's motion for summary judgment, Tucker labels and argues separately a "Race discrimination" claim and an "Assignment and 'Promotion' claim" but it is clear based on Tucker's arguments in her brief that these two claims are one and the same.  Accordingly, they will be considered together.  Although referencing promotions, Tucker does not appear to be asserting a failure to promote claim, stating in her deposition that "we don't get promotions unless you get promoted in a new job" and answering "No" in response to the question of "Other than the special projects that we talk about, is there a promotion that you contend that you didn't get?"  In addition, Tucker is not alleging sex discrimination in relation to her assignment claim, having not set forth or otherwise referenced any claims based on sex in her EEOC charge and stating in her deposition that "I believe I'm not on any of those teams due to my race and retaliation."

rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *Id.* (quotation marks and citation omitted). Then, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for not hiring the plaintiff. *Id.* The ultimate burden then falls on the plaintiff to produce evidence sufficient to create a genuine issue of material fact regarding whether the employer's proffered nondiscriminatory justifications are mere pretext for intentional discrimination. *Id.* "In reverse discrimination cases, the plaintiff has also been expected to show that 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004) (quoting *Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997)). A plaintiff can show suspicious background circumstances by showing evidence that her employer is inclined to discriminate invidiously against whites or something "fishy" about the facts that raises an inference of discrimination. *Id.* at 674.

As an initial matter, the Court notes that Tucker states that she did not ask to be assigned to many of the assignments to which she states she aspired "[b]ecause at the time I didn't know that I was able to ask. I thought it was just chosen by the supervisors, since everything else was chosen." Tucker cannot complain about not being assigned to a task that she did not even ask about and where, as here, there is no evidence that inquiry would have been futile. *Gentry v. Georgia-Pacific Corp.*, 250 F.3d 646, 652-53 (8th Cir. 2001).[7]

With respect to the One Point Desk assignment–the primary focus of her claim of race

---

[7] Tucker does not controvert Entergy's assertion, as stated in its statement of material facts not in dispute, that none of the "special projects" she complains about carry any raise in pay, benefits, seniority, or duties. Accordingly, that assertion is deemed admitted. *See* Local Rule 56.1.

discrimination–Tucker states that it was after receiving the September 2009 coaching and

counselor letter and, hence, after filing her EEOC charge five days later, that she asked to be

taken off the escalation queue following which in June 2010 she asked to be put back on the

queue, so that she could "one day get the One Point Desk and learn that position."  Tucker,

however, has not exhausted her administrative remedies with respect to this claim.

A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal

court.  *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006).  A claimant must first timely file

an administrative charge with the EEOC.  *Id.*  The charge must be sufficiently precise to identify

the parties, and to describe generally the action or practices complained of.  *Id.*  Allegations

outside the scope of the EEOC charge circumscribe the EEOC's investigatory and conciliatory

role, and for that reason are not allowed.  *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827,

836 (8th Cir. 2000).  The plaintiff must also receive from the EEOC a "right to sue" letter.

*Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996).  "The proper exhaustion of

administrative remedies gives the plaintiff a green light to bring her employment-discrimination

claim, along with allegations that are 'like or reasonably related' to that claim, in federal court."

*Id.* (quoting *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (holding

that a plaintiff in a Title VII action will be deemed to have exhausted administrative remedies as

to allegations contained in a judicial complaint that are like or reasonably related to substance of

charges timely brought before the EEOC)).

Although Tucker references the One Point Desk in her EEOC charge, she does not point

to any opening or assignment to the One Point Desk in the time before she filed her EEOC

charge in September 2009, stating that prior to getting the September 2009 coaching and

counseling letter, she was "fine" and "happy" and enjoying her job and that her failure to get assigned to the One Point Desk was "probably when [she] started making all of these—bringing up attention of violations" after receiving the coaching and counseling letter.[8]  In addition, Tucker states in her EEOC charge that the latest act of alleged discrimination occurred on September 16, 2009.  Neither Entergy nor the EEOC was on actual notice that Tucker was alleging discrimination after September 2009 and because acts such as failure to promote or refusals to hire constitute discrete employment actions, it is not reasonable to expect the EEOC to look for and investigate such adverse employment actions if they are nowhere mentioned in the administrative charge.  *Parisi v. Boeing Co.*, 400 F.3d 583, 585-86 (8th Cir. 2005).  Accordingly, Tucker has not exhausted her administrative remedies with respect to not being assigned to the One Point Desk.[9]

Even were Tucker's claims about not being assigned to the One Point Desk properly before the Court, supervisor Taylor told Tucker in response to her June 2010 request to be put back on the queue so that she could "one day get the One Point Desk and learn that position" that there were sufficient CSR's in the escalation queue at the time and Tucker states that she "believed her that she said that there was enough."  Entergy has proffered a legitimate, nondiscriminatory reason for not assigning Tucker to the One Point Desk and Tucker has not produced evidence showing that this legitimate, nondiscriminatory reason was a pretext

---

[8] Tucker states that in March 2009 she had begun pointing out that black employees with less seniority were "working the One Point Desk, doing special projects," but she does not reference specific openings and she does not discuss the qualifications of those employees and how they were either less qualified than her or possessed equal qualification.

[9] Tucker also claims that supervisors were requiring her to obtain certain training, especially for irrigation customers (which typically is a farmer who needs electric power for a crop irrigation pump) and business training, before being assigned to the One Point Desk.  Tucker alludes to not being provided training with respect to handling calls from irrigation customers, but she admitted that she was selected to learn the protocol for handling business customers in Mississippi for both irrigation and business.

for discrimination, stating instead that she believes that reason.  Accordingly, Entergy is entitled to summary judgment on Tucker's race discrimination claim based on a failure to assign her to special projects.[10]

2

The Court next addresses Tucker's argument, as set forth in her response to Entergy's motion for summary judgment, that she has established a racially hostile work environment claim.  The Court finds that Entergy is entitled to summary judgment on this claim.[11]

Title VII prohibits a racially hostile work environment.  *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) (citing 42 U.S.C. § 2000e-2(a)(1) (prohibiting an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race")).  A hostile work environment exists when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).  The hostile work environment standard contains both a subjective and an objective component, thus, Tucker is required to make a showing of a working environment "'that a reasonable person would find hostile or abusive, and one that [she] in fact

---

[10] Moreover, Tucker has adduced no evidence that Entergy is inclined to discriminate invidiously against whites or something "fishy" about the facts that raises an inference of discrimination.  *Perry,* 375 F.3d at 674.  Accordingly, Tucker has not shown that 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"  *Id.* at 673 (quoting *Duffy,* 123 F.3d at 1036).

[11] Although Tucker at times seems to conflate hostile work environment based on sex and hostile work environment based on race, her EEOC charge, as previously noted, does not set forth or otherwise reference any claims based on sex and her brief in support of her response to Entergy's motion for summary judgment makes clear that she is alleging only a racially hostile work environment.  *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5 ("Ms. Tucker meets her burden of providing sufficient evidence to support her claim of racially hostile work environment.").

did perceive to be so.'" *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787).

Among other things, to establish a prima facie case of a hostile work environment, Tucker must

demonstrate that "'the harassment affected a term, condition, or privilege of [her] employment.'"

*Id.* (quoting *Elnashar v. Speedway SuperAmerica, LLC,* 484 F.3d 1046, 1058 (8th Cir.2007)).

Only incidents that "'have a racial character or purpose'" can support Tucker's claim.  *Id.*

(quoting *Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 893 (8th Cir.2005)).  The stringent

hostile work environment standard is designed to "'filter out complaints attacking the ordinary

tribulations of the workplace, such as the sporadic use of abusive language ... and occasional

teasing.'" *Id.* (quoting *Faragher,* 524 U.S. at 788); *see also Joens v. John Morrell & Co.,* 354

F.3d 938, 941 (8th Cir.2004) (noting that Title VII does not create a federal remedy for all

offensive language and conduct in the workplace).

　　　　While there is no doubt that Tucker's appointing herself the "hall monitor" and reporting

what she deemed to be violations of company policy by coworkers did little to endear her to

those with whom she worked, Tucker "offers little more than speculation and conjecture" that

the incidents of which she complains "had anything to do with race." *Fairview Ridges Hosp*.,

625 F.3d at 1083 (citing *Anderson v. Durham D & M, LLC,* 606 F.3d 513, 519 (8th Cir.2010)).[12]

No "reasonable person would find [those incidents] hostile or abusive," *id.* (citing *Faragher,* 524

U.S. at 787), and those allegations thus do not corroborate Tucker's claim that she suffered from

a hostile work environment even as they are considered in the totality of the circumstances of

---

[12] These include Tucker's claims of not being selected for the One Point Desk, supervisors not talking to her, coworkers making derogatory comments about her, receiving a coaching and counseling letter for engaging in the same type of activity as other employees who did not receive such a letter, receiving emails from her supervisor advising her not to pass from one segment to another without informing her supervisor, certain black employees talking on their cell phones, and a coworker allegedly stating to others, "Better hope I don't see her at Wal-Mart" (which Tucker acknowledged was made because she had told on the coworker for not wearing shoes).  Many of these alleged incidents, it should be noted, post-date Tucker's September 2009 EEOC charge.

Tucker's work environment.  *Id*. at 1083-84.  Considering the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with Tucker's work performance, the Court finds that the totality of the evidence, taken in the light most favorable to Tucker, simply does not support Tucker's contention that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter" her conditions of employment, and Tucker thus has not successfully established a hostile environment claim.  *Id*. at 1085-86 (citing *Harris*, 510 U.S. at 21).

3

Tucker next argues in her response to Entergy's motion for summary judgment that she presents sufficient evidence to support her claim for disparate discipline based on the September 2009 coaching and counseling letter for improperly looking at a customer account.  Entergy is entitled to summary judgment on this claim as Tucker admitted that a coaching and counseling letter is not discipline and even comes before oral warnings, and that a grievance she filed related to this letter was denied "because it's not disciplinary, so the supervisors can put anything in an employee folder."  Tucker has not alleged that she received any decrease in pay, a demotion, or other adverse employment action with respect to the coaching and counseling letter.

4

Tucker next argues, as set forth in her response to Entergy's motion for summary judgment, that she presents sufficient evidence to support her claim for retaliation.  The Court finds that Entergy is entitled to summary judgment on this claim.

In a circumstantial-evidence case like this one, the *McDonnell Douglas* analytical framework helps the court answer the ultimate question whether the employer's adverse action against the employee was motivated by retaliatory intent. *Tyler v. University of Arkansas Bd. of Trustees*, 628 F.3d 980, 985 (8th Cir. 2011) (internal quotation marks and citation omitted)  As the first step of the framework, the plaintiff must establish a prima facie case of retaliation by showing that (1) the plaintiff engaged in protected conduct, including opposition to an action prohibited by Title VII; (2) she was subjected to an adverse employment action, and (3) there is a causal nexus between the protected conduct and the adverse action. *Id.*  In terms of the causal connection, the plaintiff must show that the protected conduct was a determinative—not merely motivating—factor in the employer's adverse employment decision. *Id.*  If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. *Id.* at 986.  If the defendant does so, the plaintiff can still prevail on a final step of the *McDonnell Douglas* analysis by proving, by a preponderance of the evidence, that the reasons proffered by the employer are merely pretext for discrimination. *Id.*

Tucker states that the September 2009 coaching and counseling letter–and the basis of her EEOC charge filed five days later–is the first act of retaliation of which she is complaining. As previously noted, however, Tucker admitted that a coaching and counseling letter is not discipline and she thus has not established that she was subjected to an adverse employment action.

Even if the September 2009 coaching and counseling letter constituted adverse employment action, she has not established that there is a causal nexus between the last act of alleged protected conduct in June 2009 and the coaching and counseling letter that was issued

-16-

some three months later.  Generally, more than a temporal connection is required to present a genuine factual issue on retaliation.  *Tyler*, 628 F.3d at 986 (internal quotation marks and citation omitted).  As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation. *Id*.  The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months.  *Id*.  *Cf. Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir.2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was 'sufficient, but barely so.' ") (internal citations omitted).

In this case, given the approximate three month delay between Tucker's last complaint of discrimination and the coaching and counseling letter, and given also the absence of other evidence of causation, the September 2009 coaching and counseling letter was not sufficiently contemporaneous with the last complaint of discrimination in June 2009 to indicate a causal connection.  *Cf. Kipp v. Missouri Highway & Transp. Com'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("the interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link.").[13]

5

Finally, Tucker argues in her response to Entergy's motion for summary judgment that she presents sufficient facts to support her claim of gender discrimination.  Although not raised

---

[13] To the extent Tucker is complaining of discriminatory and retaliatory acts after she filed her September 2009 EEOC charge and which may be the subject of a subsequent EEOC charge that is not a part of this record, she never moved to amend her complaint to include any post-September 2009 alleged discriminatory and retaliatory acts.

by the parties, the Court finds that Entergy is entitled to summary judgment on Tucker's gender

discrimination claim due to her failure to exhaust her administrative remedies with respect to

such claim.

As previously noted, a plaintiff in a Title VII action will be deemed to have exhausted

administrative remedies as to allegations contained in a judicial complaint that are like or

reasonably related to substance of charges timely brought before the EEOC.  *Williams*, 21 F.3d

at 222.  Tucker's September 16, 2009 EEOC charge checked only the boxes for race and

retaliation and alleged that she had been discriminated against beginning March 20, 2009 based

on race and in retaliation for reporting unlawful employment practices; there was no reference to

sex or gender in her EEOC charge.  Tucker presents no argument or evidence to this Court

demonstrating that her current claim of gender discrimination is like or reasonably related to any

claim raised in her 2009 EEOC charge and the facts of this case do not permit such a finding.

*Cf. Carlisle v. Missouri Dept. of Mental Health*, No. 4:05cv2415 SNL, 2006 WL 2795349

(E.D.Mo. Sept. 27, 2006) (claims for sex discrimination are not like or reasonably related to

claims for race discrimination); *Rogers v. Maco Management Co. Inc*., No. 1:03cv152 RWS,

2006 WL 288100 (E.D.Mo. Feb. 7, 2006) (noting that a claim of race discrimination is separate

and distinct from a claim of sex discrimination and holding that plaintiff did not exhaust claims

based on race discrimination where his EEOC charge alleged only sex discrimination).

Accordingly, Tucker did not exhaust her claim of gender discrimination and Entergy is thus

entitled to summary judgment on that claim.[14]

---

[14] Even if Tucker's gender discrimination claim was like or reasonably related to her race discrimination claim, the Court would grant summary judgment to Entergy on that claim as Tucker points to nothing in the record even suggesting that a prima facie case of gender discrimination has been established.

III

For the foregoing reasons, the Court grants Entergy's motion for summary judgment [doc.#9] in its entirety.  Judgment will be entered accordingly.


IT IS SO ORDERED this 1ˢᵗ day of June 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE